# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

AMY T.[1],

                               Plaintiff

      v.                                       5:18-CV-1462
                                                        (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                               Defendant.

---

STEPHEN R. DOLSON, ESQ., for Plaintiff
HUGH DUN RAPPAPORT, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

On June 4, 2015, plaintiff protectively filed[2] an application for Supplemental

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

Security Income Benefits ("SSI"), alleging February 20, 2012 as the disability onset date. (Administrative Transcript ("T") at 10, 49, 146-54).  In her application, plaintiff alleged disability due to severe migraines with stroke-like symptoms, depression, anxiety, back impairments, chronic neck and back pain, nerve damage on the left side of her body, fibromyalgia, insomnia, spinal impairments, and a pinched nerve in her cervical spine. (*See* T. 171).  Her claim was initially denied on October 28, 2015. (T. 49).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held by video on November 16, 2017 before ALJ John P. Ramos.  (T. 24-43).  Plaintiff testified at the hearing. (*Id.*).  On January 2, 2018, ALJ Ramos found that plaintiff was not disabled from June 4, 2015 through the date of his decision. (T. 10-19).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 30, 2018. (T. 1-4).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . "  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering

his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

### III. __FACTS__

Plaintiff was born on March 12, 1981, and was 34 years old at the time of her application for SSI benefits. (T. 18). At the hearing, she testified that she lived in a four-bedroom home, with her boyfriend, his son, and plaintiff's two children.[3] (T. 28-29). Plaintiff's daughter receives SSI based upon her medical issues, and plaintiff is her representative payee. (T. 29). Plaintiff testified that she graduated from high school.[4] (T. 28). Plaintiff's last employment was part-time at Thrifty Shopper in 2012. (T. 28).

Plaintiff testified that her primary care physician was Dr. Jon Emerton, M.D., and that she had been treating with him for five years. Plaintiff was also seeing neurologist, Dr. Abdul Latif for her migraine headaches. (T. 30). Plaintiff testified that her migraine headaches kept her from working, and that Dr. Emerton put her on 100% disability because of these headaches. (T. 30-31). Plaintiff testified that she was on medication, but that she was still getting headaches four or five times per week, and that they would last for two and one half to three hours each. (T. 31). Plaintiff stated that when she was having a headache, she would feel sick to her stomach, and she had to lie down in a dark room with no noise. (T. 31). Plaintiff testified that she was also getting Botox injections for her migraines, which helped, but she was still getting four or five headaches per week. (T. 32). Although plaintiff had medication to take when she felt

---

[3] Plaintiff's daughter was 16 years old, her son was 12, and her boyfriend's son was 11. (T. 29).

[4] In his decision, the ALJ noted that plaintiff obtained an IEP diploma, which is not the equivalent of a high school diploma. (T. 18). Thus, the ALJ found plaintiff to have "a limited education." (*Id.*)

the migraines coming on, often they would come "out of the blue," so she did not have time to take the medication. (T. 32).

Plaintiff testified that she had fibromyalgia. (T. 33). She took Lyrica for this condition, and the medication helped. (*Id.*) She stated that she was still in pain, but not in severe pain. (*Id.*) Plaintiff also testified that she had COPD,[5] but was not seeing any specialist to treat it. (T. 34). Plaintiff was taking Wellbutrin for her depression, and the medication helped a little. She was not seeing a counselor or a mental health specialist for her depression. (T. 35-36). Plaintiff's boyfriend does all the household chores, although plaintiff could cook, depending on how she felt. (T. 36-37). Plaintiff went grocery shopping with her boyfriend, but she did not get groceries off the shelves, carry them, or put them away. (T. 37).

Plaintiff testified that the heaviest thing she could comfortably lift was a chair. (T. 37). Plaintiff testified that she could stand in one place for about five minutes, could walk 25 steps to her sister's house, and could sit for approximately 10-15 minutes before she had to stand up and stretch. (T. 38). Plaintiff testified that, approximately one month before the hearing, she began to experience numbness in her left side. (T. 40-41). She stated that her doctors were checking into it. (T. 41). Plaintiff stated that she spent her days watching television, but that she would have to get up and move around. (*Id.*) She also pet her dog and tried to go outside if it was not too cold. (*Id.*) Plaintiff testified that her depression made her cry two or three times per day, and that she could stay in her room all day, but came out because of the children. (*Id.*) She

---

[5] Chronic obstructive pulmonary disease.

testified that she went to her children's sporting events, but had a hard time sitting on the bleachers. (T. 42).

The ALJ's decision provides a statement of the medical and other evidence of record. (T. 12-18). Rather than reciting this evidence at the outset, I will discuss the relevant details below, as necessary to address the issues raised by plaintiff, and with any changes or modifications noted in my decision.

## IV.    THE ALJ'S DECISION

The ALJ first found that plaintiff had not engaged in substantial gainful activity since her application date of June 4, 2015. (T. 12). Next, the ALJ found that plaintiff had the following severe impairments at step two of the sequential evaluation: degenerative disc disease and migraine headaches. (*Id.*). The ALJ further found that, although plaintiff testified that she had fibromyalgia, asthma, and COPD, the evidence of record was insufficient to "establish these conditions as medically determinable impairments with severe symptoms." (*Id.*) The ALJ also noted that plaintiff alleged having depression and anxiety. (T. 12-13). While these were "medically determinable impairments," the ALJ found that they were not severe. (*Id.*) At the third step, the ALJ determined that plaintiff's severe impairments did not meet or medically equal the criteria of any listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P. (T. 14).

At step four of the analysis, the ALJ found that plaintiff was able to perform light work, as defined in 20 C.F.R. 416.967(b), with "some mental, non-exertional work limitations." (T. 14-17). The ALJ evaluated the medical and other evidence of record,

giving relative weight to the various medical reports, including those authored by plaintiff's primary care physician, Dr. Jon A. Emerton. (*Id.*)

The ALJ determined that plaintiff retained the ability to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention/concentration for simple tasks, and regularly attend to a routine and maintain a schedule. (T. 14). The ALJ also found that plaintiff could relate to, and interact with, others to the extent necessary to carry out simple tasks. (*Id.*) She could handle reasonable levels of simple work-related stress, in that she could make decisions directly related to the performance of simple work, and handle usual workplace changes and interactions associated with simple work. (*Id.*) In making this RFC determination, the ALJ stated that he considered all of the plaintiff's symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929" and Social Security Ruling ("SSR") 16-3p. (*Id.*)

The ALJ then determined that plaintiff plaintiff had no past relevant work. (T. 17). However, he also found that "[c]onsidering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (T. 18) In making this determination, the ALJ found that plaintiff's additional non-exertional impairments would not preclude the ALJ from utilizing the Medical Vocational Guidelines ("the Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2 as a framework. (*Id.*) Using section 202.17 as a framework, the ALJ found that plaintiff was not disabled from the application date

of June 4, 2015 through the date of the ALJ's decision. (T. 18-19).

## V. ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1. The RFC is not supported by substantial evidence because the ALJ failed to include bending and reaching limitations. (Pl.'s Br. at 5-10) (Dkt. No. 10).

2. The ALJ substituted his own judgment for competent medical opinion at step 4. (Pl.'s Br. at 10-13).

Defendant argues that the ALJ's decision is supported by substantial evidence and should be affirmed. For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

## DISCUSSION

## VI. RFC EVALUATION

### A. Legal Standards

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . " A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### B.  Application

Plaintiff makes two arguments in favor of reversing the Commissioner's decision.  Both arguments relate to the ALJ's determination of plaintiff's RFC, the first relating to plaintiff's physical non-exertional limitations, and the second, to her mental limitations.

### 1.  Physical

Plaintiff first argues that the ALJ erred in failing to include reaching and bending

limitations in his RFC determination at step 4, and that these restrictions would have precluded the use of the medical vocational guidelines at step 5 of the sequential evaluation. Plaintiff bases this argument on the consultative medical report, written by Dr. Elke Lorensen, dated October 5, 2015. In this report, Dr. Lorensen found that plaintiff had "no gross limitations to sitting, standing, walking, or handling small objects with the hands." (T. 320). Dr. Lorensen also found that plaintiff would have "moderate restrictions with bending, reaching, and lifting." (*Id.*)

In his RFC determination, the ALJ gave Dr. Lorensen's opinion "[e]videntiary weight." (T. 16). The ALJ then found that plaintiff could perform light work, with some additional "mental" restrictions, but did not include any specific restrictions on bending or reaching, reflecting Dr. Lorensen's opinion. (T. 14). Plaintiff argues that the ALJ "gives no rationale as to why no limitations on bending or reaching were included within the [RFC] finding." (Pl.'s Br. at 6). Plaintiff also argues that Dr. Lorensen's opinion was "vague," and the use of the term "evidentiary weight" was unclear. (*Id.* at 6-7).

The ALJ considered Dr. Lorensen's opinion in detail. (T. 16). The ALJ included a citation to Dr. Lorensen's assessment of "moderate" limitations on bending and reaching. (T. 16). The ALJ then stated that "[a]lthough somewhat vague, ***these limitations*** support a finding that the claimant could perform work requiring light exertion." (T. 16) (emphasis added). This court has held that moderate restrictions on

reaching and bending are consistent with an ability to perform a full range of light work. *Linda v. Comm'r of Soc. Sec.*, No. 18-CV-726, 2019 WL 3387993, at *7 (N.D.N.Y. July 26, 2019) (reaching); *Patrick J. v. Comm'r of Soc. Sec.*, No. 17-CV-1377, 2019 WL 917963, at *8 (N.D.N.Y. Feb. 2, 2019) (bending); *Michael M. v. Comm'r of Soc. Sec.*, No. 17-CV-1038, 2019 WL 530801, at *11 (N.D.N.Y. Feb. 11, 2019) (bending and reaching). *See also Koscelski v. Comm'r of Soc. Sec.*, No. 1:18-CV-1480, 2019 WL 7403715, at * 4 (W.D.N.Y. Dec. 30, 2019) (same) (citations omitted); *Amanda L. v. Saul*, No. 8:18-CV-1221, 2019 WL 5865388, at *8, n.3 (N.D.N.Y. Nov. 8, 2019) (same) (citing *Gurney v. Colvin*, No. 14-CV-688, 2016 WL 805405, at *3 (W.D.N.Y. Mar. 2, 2016)).

The ALJ correctly stated that the medical evidence did not contain any treating source statement, other than a "conclusory DSS form signed by her family doctor."[6] (T. 17). Although Dr. Emerton submitted a check-box form to the DSS, stating that plaintiff was "totally disabled," he failed to complete any of the questions regarding plaintiff's physical abilities. (T. 464). Such conclusory opinions, even from a treating physician, are entitled to "no particular weight" because the ultimate determination of disability is reserved to the Commissioner. *Jones v. Berryhill*, __ F. Supp. 3d __, 2019 WL 5929438, at *7 (S.D.N.Y. Nov. 12, 2019) (citing inter alia *Wright v. Berryhill*, 687 F. App'x 45, 48 (2d Cir. 2017) (summary order)).

---

[6] DSS refers to the Department of Social Services, and the form is entitled "medical report for employability." (T. 464).

There are no other medical source statements in the record which assess the plaintiff's functional abilities. Although Dr. Emerton's treatment notes mention that plaintiff's pain was exacerbated by "bending," he never finds any pain caused by reaching or finds any limitation on plaintiff's ability to reach.[7] Dr. Lorensen conducted range of motion tests on plaintiff in making her RFC determination. On August 19, 2015, Dr. Latif, who plaintiff was seeing mainly for her headaches stated that plaintiff's motor examination did not show any weakness in her right upper and lower extremities,

---

[7] On October 25, 2017, Dr. Emerton reported that plaintiff had "mild DDD on MRI in 2014," and that plaintiff "reported" that her back was "killing [her] esp. bending over . . . ." (T. 465). She reported that the Gabapentin and Amytriptyline had not helped, but that the Lyrica had helped. (*Id.*) On August 30, 2017, on examination, Dr. Emerton reported that plaintiff had no bony spinal tenderness, mild tenderness in the lumbar spinal region with mild spasm, normal strength and sensation in her lower extremities, and normal gait. (T. 467). Dr. Emerton's notes reflected plaintiff's report that her back was "killing" her, especially with bending, but there was no complaint about reaching. (T. 468). Dr. Emerton did not report any problem with plaintiff's reaching. Dr. Emerton's reports were identical regarding the examination of plaintiff's back on July 19, 2017 (T. 470-72), May 2, 2017 (T. 473), March 21, 2017 (T. 474), and February 1, 2017 (T. 479). On August 1, 2016, plaintiff told Dr. Emerton that she had fibromyalgia and had pain "everywhere," but Dr. Emerton's examination did not include any statement about fibromyalgia, back pain, or any limitations associated with it. (T. 482-83). The same is true for Dr. Emerton's report dated January 20, 2015. (T. 483-84) (duplicate report at 264-65). On June 26, 2013, plaintiff saw Dr. Emerton for a follow-up. In that report, Dr. Emerton mentioned "increasing zoloft," but stated that there were "no other concerns at this time." (T. 268). Earlier reports from Dr. Emerton mention plaintiff's depression, but refer to plaintiff seeing Dr. Latif regarding her other issues. (*See e.g.* T. 272 - report dated May 13, 2013; T. 274 - April 3, 2013). On February 21, 2013, plaintiff reported some trouble walking and some numbness on her left side, but Dr. Emerton found grossly intact strength in left arm and leg "globally," but "variably diminished." (T. 276). His only "assessment" involved plaintiff's migraine headaches. (T. 276-77). Dr. Emerton commented that plaintiff had "some residual weakness," but that "imaging did not reveal any abnormality that would account for neurologic symptoms." (T. 277). An MRI, dated April 24, 2104 showed only minimal disc bulging at L4-5 and L-5-S1, without spinal stenosis or exiting nerve root compression. (T. 286-87). On November 9, 2012, plaintiff's cervical spine x-ray showed normal alignment, intact neural foramina bilaterally at each cervical level. (T. 289). There was a "dextroconvex" curve in the cervical spine at the AP level, but the impression was that the curve could be due to spasm or positioning. The reviewer stated that "otherwise," the cervical spine series was negative. (*Id.*) Jeffrey M. Smith, P.A. reported in 2015 that an MRI of plaintiff's cervical spine on May 30, 2014 was "essentially normal." (T. 295).

but did have a give way weakness in her left upper and lower extremities.[8] (T. 300).

Her muscle tone was normal, and sensation to pinprick was equal on both sides.

Social Security Ruling ("SSR") 85-15, identifies four types of "bending:" stooping, crouching, crawling, and kneeling. 1985 WL 56857 at *7. The ruling explains that the light occupational base is "virtually intact" for an individual who can stoop or crouch "occasionally" and because "crawling" and "kneeling" are "relatively rare," limitations on those activities are of "little significance" in the broad world of work. *Id.* While "significant" reaching limitations could eliminate a large number of occupations, this does not apply to "moderate" restrictions. *Gurney v. Colvin*, 2016 WL 805405, at *3 & n.2 (W.D.N.Y. Mar. 2, 2016). Dr. Emerton's and Dr. Latif's progress notes are consistent with Dr. Lorensen's opinion, finding that plaintiff had no more than "moderate" reaching limitations.

Plaintiff attempts to distinguish SSR 85-15 by arguing that the ALJ's RFC "presupposed that there would be occasional bending in Plaintiff's work capacities, despite clear indication throughout the record that Plaintiff documented a bending limitation." (Pl.'s Br. at 7-8). No medical provider found that plaintiff was unable to bend "occasionally." A moderate limitation in bending clearly would incorporate bending to some degree because the limitation is only "moderate." The court must

---

[8] Plaintiff herself denied weakness in her arms. (T. 370 - 5/3/17, T. 372 - 12/13/16). She did report weakness in her arms on November 1, 2016. (T. 374). On examination, Dr. Latif found no focal weakness on the right side, but did find the give way weakness on the left. (T. 374).

determine whether substantial evidence supports the ALJ's decision, not whether substantial evidence also supports the plaintiff's position. *Gnojek v. Comm'r of Soc. Sec.*, No. 18-CV-121, 2019 WL 4688734, at *4 (W.D.N.Y. Sept. 26, 2019) (citing *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order)). As stated above, plaintiff would be able to perform light work, even assuming that the plaintiff had "moderate" limitations in the ability to bend and reach as found by Dr. Lorensen, notwithstanding the ALJ's failure to include such specific limitations in the RFC.

### 2. Mental Limitations

Plaintiff argues that the ALJ erred in failing to properly consider plaintiff's mental limitations. Plaintiff does not argue that the ALJ erred in finding that these impairments were not severe. Rather, plaintiff argues that the ALJ erred in his consideration of these non-severe impairments at step four of the sequential analysis by substituting his opinion for that of the consultative psychologist's opinion. This court finds that even if the ALJ erred in making a conclusion as to the source of plaintiff's limitations, that any error in this regard was harmless.

The ALJ considered plaintiff's mental restrictions extensively in his decision at step 2 and again at step 4. (T. 13). Plaintiff was not in counseling, nor was she being treated by any mental health professional. Her treating primary care physician prescribed Wellbutrin for depression. At step 4, the ALJ discussed the opinion of

examining consultative psychologist, Carly Melcher, Ph.D. (T. 17). Dr. Melcher

diagnosed "major depressive disorder and generalized anxiety disorder with panic

attacks. (T. 313-14). Dr. Melcher noted a need for further evaluation to rule out a panic

disorder, a specific learning disorder, and intellectual disability. (T. 314).

Notwithstanding these diagnoses, Dr. Melcher found that plaintiff could follow and

understand simple directions and instructions, and perform simple tasks independently.

She had a "mild limitation" in her ability to maintain attention and concentrate,

maintain a regular schedule, and make appropriate decisions. (T. 17) (citing T. 313-14).

She could relate adequately with others, but had a moderate limitation in the ability to

learn new tasks, perform complex tasks independently, and deal appropriately with

stress. (*Id.*)

Dr. Melcher concluded by stating that her results were consistent with psychiatric

and cognitive problems, but that "in itself, this does not appear to be significant enough

to interfere with the claimant's ability to function on a daily basis." (T. 314). The ALJ

was able to rely on this statement in correctly finding that the plaintiff's mental

impairments were not "severe" at step 2.[9]  However, at step 4, the ALJ went further by

stating that although plaintiff had "mental work limitations," "the undersigned

---

[9] At step 2, the ALJ also reviewed a non-examining consultative report by Dr. Sandra Juriga, Ph.D., who found that plaintiff's affective disorder was not severe. (T. 13). Even though Dr. Juriga found that plaintiff's anxiety was "severe," she further found that "the effect of plaintiff's mental symptoms [was] insufficient to warrant an opinion regarding mental work limitations." (T. 13).

considers them due to the headaches, the effect of other physically based symptoms and possible loss of concentration, not due to the effect of mental impairments." (T. 17). The ALJ incorporated Dr. Melcher's limitations into the RFC, but somehow determined that the limitations were from causes other than those stated by Dr. Melcher. The ALJ appears to have based this determination on the fact that plaintiff's mental impairments were "not severe." (T. 17). The ALJ's language implies that he may be making a determination of the source of plaintiff's limitations, a finding that the ALJ is unqualified to make. Thus, to the extent that the ALJ's statement may be considered as substituting his opinion for that of Dr. Melcher as to the cause of plaintiff's limitations, it is error.

Plaintiff argues that this error warrants a remand, without considering whether it is harmless. However, the harmless error analysis is applicable to Social Security cases. *See Thompson v. Comm'r of Soc. Sec.*, No. 10-CV-1085, 2011 WL 5080239, at *13 (N.D.N.Y. Aug. 18, 2011) (noting that the harmless error standard is applied to Social Security actions in appropriate circumstances) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *Jones v. Barnhart*, No. 02-CV-0791, 2003 WL 941722, at *10 (S.D.N.Y. Mar. 7, 2003); *Seltzer v. Comm'r of Soc. Sec.*, No. 07-CV-0235, 2007 WL 4561120, at *10 (S.D.N.Y. Sept. 26, 1995)).

Further, the Second Circuit has recently reaffirmed that a remand is unnecessary where, not withstanding the ALJ's errors in weighing the evidence or applying the law,

proper consideration would not have changed the outcome. *Johnson v. Comm'r of Soc. Sec.*, No. 18-3770, __ F. App'x __, 2020 WL 460341, at *2 (2d Cir. Jan. 22, 2020) (summary order) (citations omitted); *Cottrell v. Colvin*, 206 F. Supp. 3d 804, 810 (W.D.N.Y. 2016) (noting that an error is considered harmless where proper consideration of the physician's opinion would not change the outcome of the claim) (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)); *Camarata v. Colvin*, No. 14-CV-0578, 2015 WL 4598811, at *16 (N.D.N.Y July 25, 2015) (denying the request for remand because application of the correct legal standard would not change the outcome).

In *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009), the court found harmless error where the ALJ improperly discounted the treating physician's opinion, but still included the opined limitations from that opinion in the RFC, so remand would have served no purpose. In this case, although the ALJ likely went too far in "determining" that the "cause" of plaintiff's mental limitations was her physical limitations and her headaches, he included the same mental limitations proposed by Dr. Melcher in the ultimate RFC. Plaintiff was not being treated for her mental conditions by any specialist, nor was she in any counseling program.[10] Plaintiff's treating primary care physician was only prescribing medication for depression. Remanding for further analysis would not serve any purpose because the ALJ incorporated the appropriate

---

[10] On October 25, 2017, Dr. Emerton's notes indicated that although the symptoms of plaintiff's major depressive disorder were "moderate," the increase in Wellbutrin had helped. (T. 465-66).

limitations, regardless of the cause of the limitations.

## VII. <u>Step Five</u>

### A.     **Legal Standards**

Generally, the Commissioner meets his burden at the fifth step of the sequential

analysis by using the applicable Medical-Vocational Guidelines, known as "the grids."

20 C.F.R. Pt. 404, Subpt. P. App. 2; *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)

(citations omitted).  The grids take into account the claimant's RFC in conjunction with

the claimant's age, education, and work experience. *Id*.  "Based on these considerations

the grids indicate whether the claimant can engage in any substantial gainful work

existing in the national economy." *Rosa*, 168 F.3d at 78.

Exclusive reliance on the grids is inappropriate where the guidelines fail to

describe the full extent of a claimant's limitations. *Id*. (finding the ALJ erred in

applying the grids to deny benefits in a case where it was undisputed that the claimant

suffered from nonexertional impairments). "The Grids are inapplicable in cases where

the claimant exhibits a significant nonexertional impairment." *Selian v. Astrue*, 708

F.3d 409, 421 (2d Cir. 2013). This is where the nonexertional impairment has more

than a negligible impact on a claimant's ability to perform the full range of work. *Id*.

(citing Zabala v. Astrue, 595 F.3d 402, 411 (2d Cir. 2010) ).  If a claimant has

nonexertional limitations that significantly limit the range of work permitted by his

exertional limitations, the ALJ is required to consult with a vocational expert. *Zabala*,

595 F.3d at 410 (citing *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments such as pain. *Rosa*, 168 F.3d at 78 n.2 (citing *Soblewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)).

The existence of nonexertional limitations does not automatically preclude reliance on the grids, or require that the ALJ consult a vocational expert. *Id*. When the plaintiff's additional postural or non-exertional work limitations would have little or no effect on the occupational base of unskilled light work, VE testimony is unnecessary, and the ALJ uses the grids as a "framework" for decision making. *Velez v. Astrue*, No. 1:11-CV-1487, 2013 WL 474281, at *11 (N.D.N.Y. Feb. 7, 2013) (citations omitted). The ALJ must first consider whether the range of work the plaintiff could perform is so significantly diminished as to require the introduction of vocational testimony. *Id*. (citing *Samuels v. Barnhart*, No. 01 Civ. 3661, 2003 WL 21108321, at *12 (S.D.N.Y. 2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

### 2.    Application

In this case, plaintiff argues that the ALJ did not perform a proper "framework" analysis with respect to her bending and reaching limitations. At step 5, the ALJ specifically stated that "[i]f the claimant had the [RFC] to perform a full range of light

work," the grid rule 202.17 would direct a finding of not disabled. (T. 18). The ALJ then recognized that plaintiff had additional non-exertional mental limitations[11] and specifically stated that "[t]he additional limitations have little or no effect on the occupational base of unskilled light work." (*Id.*) With respect to plaintiff's non-exertional mental limitations, the ALJ found, according to SSR 85-15, "so long as an individual can perform the basic mental demands of competitive, remunerative, unskilled work, the individual may be found to be 'not disabled.'" (*Id.*) "The additional limitations have little or no effect on the occupational base of unskilled light work." (*Id.*)

The ALJ further determined, based on the limitations found by Dr. Melcher, plaintiff had "no significant limitations in the performance of these basic mental demands of work," and that as long as the plaintiff could perform these basic mental demands, the ALJ was entitled to rely upon the grids to determine whether plaintiff was disabled. (T. 19). The ALJ determined that plaintiff's occupational bases at all levels of light and sedentary work were "maintained," such that jobs existed in the national economy that she could perform. (*Id.*) The ALJ then properly used the grids to determine that plaintiff was not disabled.

This court has found that the ALJ did not err in failing to specifically consider a

---

[11] As stated above, assuming that plaintiff had the "moderate" reaching limitations discussed above, the plaintiff's functional abilities would still be consistent with the ability to perform light work. Thus, the ALJ did not have to repeat that finding at step five.

reaching or bending limitation in the RFC because even moderate restrictions in these abilities do not preclude the plaintiff from performing a full range of light work. In addition, although the ALJ erred in finding that plaintiff's mental limitations were due to physical impairments and headaches rather than any non-severe mental impairment, such error was harmless, and he properly considered plaintiff's mental limitations at step 5. The ALJ's determination is supported by substantial evidence.

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: February 5, 2020

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**